UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| JOSEPHINE B. DONAHUE,<br><br>Plaintiff,<br><br>v.<br><br>FEDERAL NATIONAL MORTGAGE ASSOCIATION AND OCWEN LOAN SERVICING, LLC,<br><br>Defendants. | Case No: 17-cv-10635-DJC |

**MEMORANDUM AND ORDER**

**CASPER, J.**                                                                                                                                      May 20, 2019

## I. Introduction

Plaintiff Josephine Donahue ("Donahue") has filed this lawsuit against Defendants Federal National Mortgage Association and Ocwen Loan Servicing, LLC ("Ocwen") (collectively, "Defendants") alleging violations of Mass. Gen. L. c. 183, § 32 and Mass. Gen. L. 183, § 4 (Count I), breach of the duty of good faith and reasonable diligence (Count II) and breach of contract and the covenant of good faith and fair dealing (Count III). D. 1-1. Ocwen has moved for summary judgment. D. 37. For the reasons stated below, the Court ALLOWS the motion.

## II. Standard of Review

The Court grants summary judgment where there is no genuine dispute as to any material fact and the undisputed facts demonstrate that the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a). "A fact is material if it carries with it the potential to affect the

outcome of the suit under the applicable law." Santiago–Ramos v. Centennial P.R. Wireless Corp., 217 F.3d 46, 52 (1st Cir. 2000) (quoting Sánchez v. Alvarado, 101 F.3d 223, 227 (1st Cir. 1996)). The movant "bears the burden of demonstrating the absence of a genuine issue of material fact." Carmona v. Toledo, 215 F.3d 124, 132 (1st Cir. 2000); see Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986). If the movant meets its burden, the non-moving party may not rest on the allegations or denials in her pleadings, Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 256 (1986), but "must, with respect to each issue on which she would bear the burden of proof at trial, demonstrate that a trier of fact could reasonably resolve that issue in her favor," Borges ex rel. S.M.B.W. v. Serrano–Isern, 605 F.3d 1, 5 (1st Cir. 2010). "As a general rule, that requires the production of evidence that is 'significant[ly] probative.'" Id. (quoting Anderson, 477 U.S. at 249) (alteration in original). The Court "view[s] the record in the light most favorable to the nonmovant, drawing reasonable inferences in his favor." Noonan v. Staples, Inc., 556 F.3d 20, 25 (1st Cir. 2009).

## III. Factual Background

The following facts are undisputed unless indicated otherwise. On or about June 22, 2010, Donahue executed a mortgage (the "Mortgage") in the amount of $484,330.00 to Reliant Mortgage Company, LLC ("Reliant") relating to real property located in Scituate, Massachusetts (the "Property"). D. 39 ¶ 1; D. 39-1; D. 45 at 1. Ocwen began servicing the Mortgage in February 2013. D. 39-6 ¶ 8. On June 10, 2014, the Mortgage was assigned from Mortgage Electronic Registration Systems, Inc. ("MERS"), as nominee for Reliant, to Ocwen. D. 39 ¶ 2; D. 39-3; D. 45 at 2.

In or around April 2014, Donahue made a verbal request for mortgage assistance from Ocwen, which Ocwen acknowledged in a letter dated April 28, 2014. D. 39-8; D. 45 at 4. The letter explained that Ocwen required a complete copy of an attached "Financial Analysis Package"

2

by June 29, 2014 from Donahue to process her request. D. 39-8 at 2; see D. 39-2 at 6. The parties dispute whether Donahue submitted the required financial information. Compare D. 39 ¶ 11, with D. 45 at 4-5.

Donahue first defaulted on her loan payments under the Mortgage in or around September 2014. D. 39 at 3 n.1; D. 45 at 3; D. 47 ¶ 16; D. 47-3. Between September 2014 and January 2015, Defendants did not send any correspondence to Donahue about the opportunity for a face-to-face meeting. D. 47 ¶ 16; D. 39-6 ¶ 20 (referring to October 28, 2015 face-to-face letter as Ocwen's "First" HUD Face-to-Face Letter). Ocwen did, however, send Donahue a 150-day notice of a right to cure the mortgage default on November 14, 2014. D. 39 ¶ 12; D. 47-3; see D. 47 ¶ 16. As of the time of the November 14th letter, Donahue had failed to make her monthly loan payments for September, October or November 2014. D. 47-3 at 2. Before 150 days had passed, in January 2015, Donahue made the outstanding payments on the Mortgage, D. 47 ¶ 16, and Ocwen reinstated the loan, D. 39 at 3 n.1; D. 45 at 3.

In March 2015, Donahue again defaulted on the Mortgage. D. 39 ¶ 7; D. 47 ¶ 17. In April 2015, Donahue entered into a "Temporary Repayment Agreement" with Ocwen. D. 39 ¶ 14; D. 39-10; D. 45 at 6. It is undisputed that Donahue failed to make any payments under the Agreement. D. 39 ¶ 15; D. 45 at 6. On May 28, 2015, Ocwen sent Donahue a pre-foreclosure referral letter, reflecting the balance owed on the Mortgage and encouraging Donahue to "call [Ocwen] immediately to discuss possible alternatives to foreclosure" if she could not make her account current. D. 39-5 at 3; D. 39-6 ¶ 17. In or about July 2015, Donahue made another verbal request for mortgage assistance, as acknowledged by Ocwen in a letter dated July 15, 2015. D. 39-11; D. 39-6 ¶ 18. Ocwen informed her that she still had not submitted a complete mortgage

3

assistance package and set a deadline of August 13, 2015 for receipt of that package. D. 39-11 at 2.

According to Ocwen, Ocwen first offered a face-to-face meeting with Donahue in a letter dated October 28, 2015. D. 39 ¶ 20, see D. 39-12. Katherine Ortwerth ("Ortwerth"), a Senior Loan Analyst at Ocwen, refers to the letter as "Ocwen's First HUD Face-to-Face Letter" and attests that it was sent to Donahue. D. 39-6 ¶ 20; 12/6/18 hearing transcript (counsel for Ocwen acknowledging that this letter was not sent by certified mail). Donahue claims that the letter was never sent because she did not receive it and the purported United States Postal Service ("USPS") tracking number on the letter reflects origin and receipt destinations in California. D. 45 at 7-8; D. 47 ¶ 13; D. 48-1.

In or about November 2015, Donahue submitted a request for modification of her delinquent loan. D. 39 ¶ 21; D. 45 at 8. By letter dated December 4, 2015, Ocwen acknowledged Donahue's request and solicited additional documentation from Donahue, including a copy of her most recent retirement, social security and death benefit income. D. 39 ¶ 22; D. 39-14; D. 45 at 8. On December 23, 2015, Ocwen sent Donahue a list of missing documents needed to review her request for modification. D. 39 ¶ 23; D. 39-15; D. 45 at 8.

On January 28, 2016, Ocwen ordered "Doorknocks" for Donahue. D. 53-1 at 7. On or about February 2, 2016, Ocwen asserts that it had a door hanger left at the Property, advising Donahue of her right to "a face-to-face interview with a representative from the mortgage on the underlying loan agreement." D. 39-16 at 3. Ocwen has filed a photo of a door hanger on a door knob that is printed on letterhead from a company called Safeguard Properties. Id. at 2. The header above the photo identifies the address as that of the Property and lists a "Completed Date" of February 2, 2016. Id. Ortwerth from Ocwen attests that it is the regular practice of Ocwen to

have Ocwen's vendor visit properties and leave a door hanger with information about a face-to-face meeting once a request is made for a property visit pursuant to 24 C.F.R. § 203.604. D. 53-1 ¶ 11. Ortwerth further attests that this practice was followed in February 2016 and that, based on her review of Donahue's file, nothing indicates that the usual procedure was not followed in this case. Id.

On February 4, 2016, Ocwen requested a face-to-face letter be sent to Donahue, as reflected in Donahue's account file. D. 53-1 at 7. On February 5, 2016, Ocwen asserts that it sent a letter informing Donahue of her right to a face-to-face meeting. D. 39 ¶ 27; D. 39-6 ¶ 26; D. 39-17. An entry dated February 8, 2016 in Donahue's account file reflects the same mailing date. D. 53-1 ¶ 6; D. 53-1 at 8. The February 8, 2016 entry also lists a USPS tracking number that corresponds to the one at the top of the letter. D. 53-1 ¶ 6; D. 53-1 at 8.

Donahue contends that Ocwen never sent the February 5, 2016 letter, because she never received it and because the tracking number—identical to the one offered for the October 28 letter—indicates origin and receipt destinations in California in March 2016. D. 45 at 10-11; D. 47 ¶ 13; D. 48-1. Donahue attests that she never received any correspondence or notice from Ocwen advising her of the option of a face-to-face meeting. D. 47 ¶ 13. She also attests that no Ocwen agent ever made a trip to the Property, id., despite the Property being within 200 miles of an Ocwen branch office, id. ¶ 10.

Donahue remained in default. D. 39 at 3 n.1; D. 44 at 9. In or around June 2016, approximately one month before the scheduled foreclosure sale, Donahue submitted another request for mortgage assistance. D. 39 ¶ 29; D. 45 at 11. On June 30, 2016, Ocwen acknowledged receipt of Donahue's request and indicated that she had until July 14, 2016 to provide all supporting documents listed in the letter. D. 39 ¶ 31; D. 39-19; D. 45 at 11. The parties dispute

whether Donahue submitted the documents.  Compare D. 39 ¶ 32, with D. 45 at 11-12.  Ocwen representatives spoke with Donahue or her authorized representatives on at least twenty occasions to discuss Donahue's mortgage and available loss mitigation options before holding a foreclose sale.  D. 53-1 ¶ 13.

By letter dated June 17, 2016, the law firm representing Ocwen informed Donahue that the foreclosure sale had been scheduled for July 21, 2016.  D. 39-20; D. 45 at 12.  Ocwen conducted an appraisal prior to the foreclosure sale that indicated the fair market value of the Property was $500,000.  D. 39-21 at 4; D. 45 at 12-13.  Donahue attests that the Property is worth more than Ocwen's assessment, based on tax assessments from the Town of Scituate.  D. 47 ¶ 19.  On July 21, 2016, Ocwen foreclosed on the Property and was the highest bidder at the foreclosure auction.  D. 39-22; D. 45 at 13.

### IV. Procedural History

Donahue instituted this action in Plymouth Superior Court on February 27, 2017.  D. 1-1.  Defendants removed the case to this Court.  D. 1.  Ocwen has now moved for summary judgment.  D. 37.  The Court heard the parties on the pending motion and took the matter under advisement.  D. 55.

### V. Discussion

#### A. Mass. Gen. L. c. 183, § 32 and Mass. Gen. L. c. 183, § 4 (Count I)

Donahue asserts that the foreclosure of the Property was unlawful under Mass. Gen. L. c. 183, § 32 and Mass. Gen. L. 183, § 4[1] because Defendants lacked a Power of Attorney ("POA") from Ginnie Mae.  D. 1-1 ¶ 76.  Mass. Gen. L. c. 183, § 32 provides that "[t]he law relative to the

---

[1] The Court understands Donahue to have intended to cite to Mass. Gen. L. 183, § 4, which relates to recordings in the registry of deeds and whose language is quoted in Donahue's complaint, D. 1-1 ¶ 72, rather than Mass. Gen. L. 184, § 4 which was cited in the header of Count I.

acknowledgement and recording of deeds shall apply to letters of attorney for the conveyance of real property." Mass. Gen. L. c. 183, § 4 states, in relevant part, that "[a] conveyance . . . shall not be valid as against any person, except the grantor or lessor, his heirs and devisees and persons having actual notice of it, unless it . . . is recorded in the registry of deeds for the county or district in which the land to which it relates lies." Ocwen argues that Donahue's claims under these statutes fail because there is no private right of action under either statute and because Ocwen had the authority to foreclose on the Mortgage. D. 38 at 20-22.

Even assuming there is a private right of action under the statutes, which Ocwen contests, the record does not reflect that Ocwen executed a conveyance of the Property on behalf of another entity, such that Ocwen required a POA from Ginnie Mae or any other entity to foreclose. The undisputed evidence shows that the Mortgage was originally executed between Donahue and Reliant, with MERS serving as nominee for Reliant, and that MERS assigned the mortgage to Ocwen on or about June 10, 2014. D. 39 ¶¶ 1-2; D. 39-1; D. 45 at 1-2. Under Mass. Gen. L. c. 183, § 21, "[t]he 'statutory power of sale' can be exercised by 'the mortgagee or his executors, administrators, successors or assigns.'" U.S. Bank Nat'l Ass'n v. Ibanez, 458 Mass. 637, 647 (2011) (quoting Mass. Gen. L. c. 183, § 21). Because MERS was named as nominee in the Mortgage, and there was nothing in the Mortgage prohibiting MERS from assigning the Mortgage, it had the authority to assign the Mortgage to Ocwen without a POA. See Francis v. CitiMortgage, Inc., No. 11-11091-GAO, 2012 WL 1038813, at *1 (D. Mass. Mar. 28, 2012) (stating that "if a mortgage names MERS as mortgagee and as nominee for the lender or its assigns, MERS has the authority to assign the mortgage to another entity"); Shea v. Fed. Nat'l. Mortg. Ass'n, 87 Mass. App. Ct. 901, 903 (2015) (holding that "despite [the note holder's] right . . . to demand and obtain an assignment of the mortgage in order to enforce its security interest and collect the debt, MERS

7

(as mortgagee) retain[s] the right to assign the mortgage unilaterally absent any restriction in the mortgage document"). The Court, therefore, holds that Ocwen is entitled to summary judgment on Count I.

### B.     Breach of the Duty of Good Faith and Reasonable Diligence (Count II)

Donahue also alleges a breach of the duty of good faith and reasonable diligence based on Defendants' failure to comply with 24 C.F.R. § 203.604(b). D. 1-1 ¶ 95. Under Massachusetts law, "a mortgagee in exercising a power of sale in a mortgage must act in good faith and must use reasonable diligence to protect the interests of the mortgagor." Mackenzie v. Flagstar Bank, FSB, 738 F.3d 486, 492-93 (1st Cir. 2013) (citation and internal quotation mark omitted). Although Donahue bases this claim on the lack of a face-to-face meeting, "the mortgagee's duty of good faith and reasonable diligence is focused on its conduct of the foreclosure sale." Figueroa v. Fed. Nat'l. Mortg. Ass'n, Civ. A. No. 12-11290-RWZ, 2013 WL 2244348, at *3 (D. Mass. May 20, 2013) (citing Seppala & Aho Constr. Co. v. Peterson, 373 Mass. 316, 326 (1977)); see Sandler v. Silk, 292 Mass. 493, 496 (1935) (noting that "[i]t has become settled by repeated and unvarying decisions that a mortgagee in executing a power of sale contained in a mortgage is bound to exercise good faith and put forth reasonable diligence"). Donahue's claim regarding the lack of a face-to-face meeting one year before the foreclosure sale, therefore, does not give rise to the claim that she alleges in Count II for a breach of the duty of good faith and reasonable diligence.

Specifically, Donahue does not address Ocwen's conduct at the foreclosure sale under Count II of the complaint or connect it to the duty of good faith and reasonable diligence in her pleading. In her opposition to summary judgment, however, Donahue asserts that Ocwen's conduct at the sale caused her damages because Ocwen paid less than market value for the Property at the foreclosure sale. D. 44 at 20-21. To the extent Donahue is indirectly invoking the price

8

Ocwen paid for the Property as a breach of the duty of good faith and reasonable diligence, this claim, too, must fail. When the mortgagee "is both seller and buyer, [its] position is one of great delicacy. Yet, when [it] has done [its] full duty to the mortgagor in [its] conduct of the sale under the power [of sale], and the bidding begins, in [its] capacity as bidder a mortgagee may buy as cheaply as [it] can, and owes no duty to bid the full value of the property as that value may subsequently be determined by a judge or jury." W. Roxbury Co-op v. Bowser, 324 Mass. 489, 492-93 (1949) (citation and internal quotation mark omitted). Here, the sale of a property at an allegedly "inadequate" price does not, without more, "show bad faith or lack of diligence." Id. at 493. The Court, therefore, grants summary judgment to Ocwen on Count II.

### C. Breach of Contract and the Covenant of Good Faith and Fair Dealing (Count III)

#### 1. Breach of Contract

Donahue alleges the Defendants breached the contract between the parties by failing to comply with Paragraph 9(d) of the Mortgage. Paragraph 9(d) provides that "[i]n many circumstances regulations issued by the [HUD] Secretary will limit Lender's rights, in the case of payment defaults, to require immediate payment in full and foreclose if not paid. This Security Instrument does not authorize acceleration or foreclosure if not permitted by regulations of the Secretary." D. 39-1 ¶ 9(d). The parties agree that the HUD regulations applicable to the Mortgage include 24 C.F.R. § 203.604(b), which states: "[t]he mortgagee must have a face-to-face interview with the mortgagor, or make a reasonable effort to arrange such a meeting, before three full monthly installments due on the mortgage are unpaid." 24 C.F.R. § 203.604(b). A "reasonable effort" requires, at minimum, "one letter sent to the mortgagor certified by the Postal Service as having been dispatched" and "one trip to see the mortgagor at the mortgaged property, unless the mortgaged property is more than 200 miles from the mortgagee . . . ." 24 C.F.R. § 203.604(d).

9

Ocwen argues that it is entitled to summary judgment on this claim because it complied with this requirement by sending letters to Donahue about a face-to-face meeting, in addition to leaving a door hanger with similar information left at the Property, and Donahue suffered no damages because of the lack of a face-to-face meeting.

To prevail on a breach of contract claim, Donahue must prove "that a valid, binding contract existed, the defendant breached the terms of the contract, and [she] sustained damages as a result of the breach." Bean v. Bank of N.Y. Mellon, Civ. A. No. 12-10930-JCB, 2012 WL 4103913, at *9 (D. Mass. Sept. 18, 2012) (alteration in original) (quoting Brooks v. AIG Sunamerica Life Assur. Co., 480 F.3d 579, 586 (1st Cir. 2017) (internal quotation marks omitted)). It is undisputed that the Mortgage here constitutes a valid, binding contract between the parties. Accordingly, the issues before the Court are whether Defendants breached its terms and whether Donahue suffered damages as a result.

As a preliminary matter, the Court notes that Donahue defaulted on the Mortgage twice— once in 2014 and once in 2015. The parties appear not dispute that Ocwen did not make any effort to conduct a face-to-face meeting within three months of the 2014 default, as required by 24 C.F.R. § 203.604(b). This failure to comply with the statute in 2014, however, cannot sustain Donahue's claim for breach of contract because she suffered no damages as a result. Even without a face-to-face meeting, Donahue was able to bring her account current at that time and Ocwen reinstated the loan. D. 39 at 3 n.1; D. 45 at 3. The Court's analysis, therefore, turns on the 2015 default.

    a)    "Reasonable Effort" to Arrange a Face-to-Face Meeting

The Court first considers whether Ocwen made a "reasonable effort" to arrange a face-to-face meeting, as required by 24 C.F.R. § 203.604(b), through the letters it sent to Donahue and the door hanger it had dispatched to the Property. As to the letters, federal courts have held that

mortgagees may prove compliance with § 203.604(b) by relying on "proof of a business system of preparing and mailing letters, and compliance with such a custom in the particular instance," along with a copy of the business letter coded with internal identification numbers, names and descriptions. Underwood v. Wells Fargo Home Mortg., Inc., No. 16-10226, 2016 WL 3182022, at *3 (E.D. Mich. June 8, 2016) (quoting Simpson v. Jefferson Standard Life Ins. Co., 465 F.2d 1320, 1324 (6th Cir. 1972)). Similarly, sworn testimony describing the ordinary practice of utilizing certified mail when sending the face-to-face meeting letters and "indicating that a certified letter was, in fact, sent" can suffice to support summary judgment in favor of the mortgagee. Campbell v. Wells Fargo Bank, N.A., Civ. A. No. 1:14-cv-03341-TWT-JFK, 2016 WL 6496458, at *8 (N.D. Ga. Oct. 6, 2016), adopted, No. 1:14-CV-3341-TWT, 2016 WL 6462070 (N.D. Ga. Nov. 1, 2016).

Here, the record reflects that Ocwen sent at least the February 2016 letter by providing a copy of the letter, a USPS tracking number, two Ortwerth affidavits validating that the letter was sent in accordance with Ocwen's regular practices and a corroborating entry from Donahue's file with Ocwen. (An earlier October 2015 letter was also sent, but apparently not by certified mail as Ocwen acknowledged at the motion hearing). Moreover, the Court finds Donahue's lack of receipt to be immaterial. See Dan-Harry v. PNC Bank, N.A., C.A. No. 17-136WES, 2018 WL 5044235, at *5 (D.R.I. Oct. 17, 2018) (observing that "[a] mortgagor's denial of having received the letter does not give rise to a factual dispute regarding the mortgagee's compliance with the requirement to send it"). The Court concludes that even just the February letter satisfied Ocwen's burden to send "at least one" face-to-face letter to Donahue. 24 C.F.R. § 203.604(b).

The Court also agrees with Ocwen that, given the circumstances, its failure to submit proof of dispatch from USPS does not bar summary judgment in its favor. See RBS Citizens NA v.

11

Sharp, 7th Dist. Mahoning No. 17 MA 0059, 2018-Ohio-2480, ¶ 4 (granting summary judgment to mortgagee who submitted copy of face-to-face letter with "evidence that said letter was sent via certified mail" and evidence that a representative was sent to mortgagor's home to attempt to arrange a meeting). Donahue argues the opposite, relying mainly upon PNC Bank, N.A. v. Wilson, 74 N.E.3d 100 (Ill. App. Ct. 2017). In Wilson, the court observed that the plain language of § 203.604(d) "requires proof from the United States Postal Service that the letter was sent." Id. at 106. There, the lender's failure to include proof from USPS was "only a technical defect in notice" and did not bar the lender from foreclosing where the borrower could not show any resulting prejudice. Id. at 106-07. The other cases Donahue cites all differ in material respects from this case and do not mandate that the lender must provide proof of dispatch from USPS. See PNC Mortg. v. Krynicki, 2017-Ohio-808, 85 N.E.3d 1024, ¶¶ 19, 25 (7th Dist.) (reversing summary judgment for lender where lender sent only one, non-certified letter to borrower that did not mention a face-to-face meeting, and lender filed conclusory, unsupported affidavit); U.S. Bank Trust N.A. v. Lopez, 107 N.E.3d 859, 866-67 (Ill. App. Ct. 2018) (concluding that letter sent via FedEx, rather than USPS, without corresponding notation of dispatch was insufficient to support summary judgment for lender); U.S. Bank Trust N.A. v. Hernandez, 88 N.E.3d 1056, 1062-63 (Ill. App. Ct. 2017) (holding that user-generated FedEx label was insufficient proof of dispatch for compliance with § 203.604(d)).

The Court also rules that Donahue's attorney's declaration that the tracking number corresponded to mail in California is unavailing because "the unexplained document from the USPS website proves nothing." Dan-Harry, 2018 WL 5044235, at *5. Donahue's attorney attests only that "[o]n or about July 10, 2017, [he] searched the USPS Tracking Results" for the tracking number on Donahue's letter. D. 48 ¶ 4. The declaration does not describe USPS tracking

procedures for letters mailed several years ago or what the results mean. The Court agrees with the reasoning in Dan-Harry that "[w]ithout some cognizable evidence to authenticate the [USPS tracking] document . . . this document does not amount to admissible evidence permitting the inference that [the lender's] certified letter was not sent." Dan-Harry, 2018 WL 5044235, at *5.

As to the in-person visit to the Property, Donahue argues that even if Ocwen dispatched the door hanger to the Property (which she contests), the visit would be inadequate because it was executed by a vendor of Ocwen that lacked the authority to conduct a face-to-face interview. D. 44 at 12. Donahue relies on Freedom Mortg. Corp. v. Newsome, in which the mortgagee did not send a timely letter nor make a timely, in-person trip to arrange a face-to-face meeting. Freedom Mortg. Corp. v. Newsome, Mass. Housing Ct., No. 12-SP-2461, slip op. at ¶¶ 20-21 (Sept. 1, 2017).[2] The court held that a subsequent visit to the property by an agent who was not authorized to conduct a face-to-face meeting with the mortgagor was insufficient cure the prior deficiency under 24 C.F.R. § 203.604(b). Id. at ¶¶ 21, 28. The Court, however, agrees with the court's conclusion in Dan-Harry that "Freedom Mortgage does not stand for the proposition that compliance with the timely trip requirement of § 203.604(d) requires that the representative who makes the trip must be prepared to conduct the face-to-face meeting on the spot. And if Freedom Mortgage somehow may fairly be read as supporting such a proposition, that holding would be error as it ignores the clear language of § 203.604(d), which states that the trip is 'to arrange' the meeting, not to conduct it in the moment." Dan-Harry, 2018 WL 5044235, at *5. In sum, the Court concludes that Ocwen submitted unrebutted evidence that it sent at least one face-to-face letter to Donahue and conducted at least one in-person visit to the Property to attempt to arrange a meeting as required by § 203.604.

---

[2] A copy of the opinion has been filed at D. 48-2.

The undisputed evidence, however, shows that Ocwen did not strictly comply with 24 C.F.R. § 203.604(b), because by Ocwen's own account, it both mailed the February 2016 face-to-face letter and visited the Property almost one year after Donahue went into default. As discussed above, § 203.604(b) requires that a lender make a "reasonable effort" to arrange a face-to-face meeting "before three full monthly installments due on the mortgage are unpaid." 24 C.F.R. § 203.604(b). Accordingly, the Court must consider whether strict compliance with the timeline established in § 203.604(b) is required.

Generally, "the mortgagee, to effect a valid foreclosure sale, must strictly comply not only with the terms of the actual power of sale in the mortgage, but also with any conditions precedent to the exercise of the power that the mortgage might contain." Pinti v. Emigrant Mortg. Co., Inc., 472 Mass. 226, 233-34 (2015). Donahue, however, has not identified a case that holds that a reasonable effort toward conducting a face-to-face meeting is condition precedent that requires strict compliance. Several courts have explicitly determined that strict compliance with the three-month window is not required. See, e.g., Grimaldi v. U.S. Bank Nat'l Ass'n, Civ. A. No. 16-519 WES, 2018 WL 1997277, at *3 (D.R.I. Apr. 27, 2018) (holding that visiting property of defaulted borrower five years after default and leaving a letter because borrower was not home satisfied requirement of making a reasonable effort at arranging face-to-face meeting); U.S. Nat'l Bank Ass'n v. McMullin, 47 N.Y.S.3d 882, 889 (N.Y. Sup. Ct. 2017) (reasoning that § 203.604(b) should not be construed to command an impossibility where lender missed the deadline and could, therefore, never achieve "strict compliance"); PNC Mortg. v. Garland, 7th Dist. Mahoning No. 12 MA 222, 2014-Ohio-1173, ¶ 30 (7th Dist. Ohio Mar. 20, 2014) (describing the "specific time deadlines" set out in HUD regulations as "aspirational").

The Court also rejects Donahue's contention that Wells Fargo Bank, N.A. v. Cook, 87 Mass. App. Ct. 382 (2015), mandates strict compliance with § 203.604(b). In Cook, the Massachusetts Appeals Court reversed the trial court's grant of summary judgment for the lender because there were disputed material facts as to whether a face-to-face meeting with the borrowers satisfied the substantive requirements of 24 C.F.R. § 203.604(b). Id. at 388. The untimely meeting took place at a mass event at Gillette Stadium with a Wells Fargo representative who "was unable [to] propose or accept any forbearance or modification options, or arrange a payment plan." Id. (alteration in original). There was also no evidence demonstrating that "personalized consideration" of the borrowers took place. Id. at 388-89. The holding in Cook, however, does not compel the conclusion that § 203.604(b) bars summary judgment to Donahue here. On the contrary, Cook specifies that "the regulations obviously do not state or require that the deadline specified in the regulations, once missed, could never again be met, thereby forever precluding the lender from accelerating the loan or exercising its right of foreclosure." Id. at 387 n.10. And finally, as noted in Dan-Harry, "to the extent that Cook has been considered by other courts (albeit not in the context of evaluating the sufficiency of a trip to the mortgaged property), its holding has been limited to its unique facts." Dan-Harry, 2018 WL 5044235, at *6 (citing cases).

    b)  Damages

Even if Donahue could show a breach of contract based on Ocwen's failure to comply strictly with § 203.604(b), Count III would still fail because Donahue has not met her burden of establishing disputed material facts showing that this alleged breach by Defendants resulted in damages. Donahue asserts that if she had been given a chance to meet with an Ocwen representative in person within the first three months of default, she "would have been given instructions on what to do or an agreement could have been met and [her] mortgage would be in

15

good standing right now." D. 47 ¶ 18. The undisputed evidence, however, belies Donahue's claim. After Donahue first defaulted in 2014, she was able to bring her account current and have the loan reinstated in January 2015. Two months later, however, she defaulted again. It is undisputed that despite reaching a "Temporary Repayment Agreement" with Ocwen in April 2015, Donahue failed to make a single payment under the Agreement and cure her 2015 default. Although Donahue submitted evidence that she could have liquidated her retirement savings in the amount of $36,194.60 (as of March 2015), she could have done so under the 2015 Agreement and did not so then or at any subsequent point. Furthermore, Ortwerth attests that Ocwen spoke to Donahue or her authorized representatives twenty times before holding a foreclosure sale, and Donahue has not articulated how these conversations would have differed from a face-to-face meeting. Accordingly, the Court concludes that the lack of an in-person meeting with Ocwen did not cause Donahue damages necessary to prevail on a breach of contract claim.

### 2. *Breach of Implied Covenant of Good Faith and Fair Dealing*

Donahue also alleges under Count III that Defendants' failure to comply with paragraph 9(d) of the Mortgage constitutes a violation of the implied covenant of good faith and fair dealing. Ocwen argues it is entitled to summary judgment on this claim because it is derivative of the breach of contract claim and the covenant creates no rights independent of the contract. D. 38 at 17-19.

The covenant of good faith and fair dealing is implied in every contract in Massachusetts. Anthony's Pier Four, Inc. v. HBC Assocs., 411 Mass. 451, 471 (1991) (citation omitted). It requires that "neither party [] do anything that will have the effect of destroying or injuring the right of the other party to the fruits of the contract." T.W. Nickerson, Inc. v. Fleet Nat'l Bank, 456 Mass. 562, 570 (2010) (quoting Anthony's Pier Four, Inc., 411 Mass. at 471). To prevail on such a claim, a plaintiff must show that the defendant "acted with . . . dishonest purpose or [with the]

conscious wrongdoing necessary for a finding of bad faith or unfair dealing." Schultz v. R.I. Hosp. Trust Nat'l Bank, N.A., 94 F.3d 721, 730 (1st Cir. 1996). "[T]he purpose of the covenant is to guarantee that the parties remain faithful to the intended and agreed expectations of the parties in their performance." Uno Rests., Inc. v. Boston Kenmore Realty Corp., 441 Mass. 376, 385 (2004).

The Court concludes that there is no evidence of Ocwen having a "dishonest purpose" or having acted with "conscious wrongdoing" that could sustain a claim of a breach of the duty of good faith and fair dealing. Rather, the evidence shows that Ocwen reinstated Donahue's loan when she made her account current in January 2015, entered into a Temporary Repayment Plan with Donahue in April 2015, communicated with Donahue twenty times about her options for loan modifications before conducting a foreclosure sale and provided various opportunities for Donahue to undergo loan modification (including immediately prior to the foreclosure sale). To the extent Donahue indirectly claims that Ocwen's assessments of her paperwork being incomplete were not made in good faith, the claims are not supported by the record. Donahue cites to no other examples of how Defendants breached the duty of good faith and fair dealing, apart from by allegedly breaching the Mortgage. See D. 44 at 25-28. Because of having articulated no other basis for this claim and the Court having concluded that Defendants did not breach the mortgage contract as discussed above, Donahue's derivative claim for breach of the implied covenant also fails. See Kolbe v. BAC Home Loans Servicing, LP, 738 F.3d 432, 453-54 (1st Cir. 2013) (holding that an allegation of a breach of the duty of good faith and fair dealing that was "wholly dependent on the premise that the [defendant] breached the contract" necessarily failed with the failure of the breach of contract claim). The Court, therefore, grants summary judgment to Ocwen on Count III.

## VI. Conclusion

For the foregoing reasons, the Court ALLOWS Ocwen's motion for summary judgment, D. 37.

**So Ordered.**

/s/ Denise J. Casper  
United States District Judge